**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Wayne EDMONDS, Charles M. Jones, Garell Malcom Ingram and Thomas E. Carlton, Defendants-Appellants.**

No. 79–5222.

United States Court of Appeals,
Fifth Circuit.

Feb. 21, 1980.

Rehearing and Rehearing En Banc
Denied April 4, 1980.

Alvin E. Entin, North Miami Beach, Fla., for defendants-appellants.

Melissa S. Mundell, William H. McAbee, II, Asst. U. S. Attys., Savannah, Ga., for plaintiff-appellee.

Before GODBOLD, RONEY and FRANK M. JOHNSON, Jr., Circuit Judges.

GODBOLD, Circuit Judge:

The four appellants were convicted of conspiracy to possess marijuana and possession with intent to distribute marijuana that was seized at Morgan's Dock, the site of a commercial fishing business, located in Georgia on the Sunbury River, which is connected by a channel to the Atlantic Ocean. We affirm the convictions.

### I. The facts.

On the evening of November 23, 1978, in a motel parking lot in Richmond Hill, Georgia, customs patrol officer (CPO) Swygert saw a ten-wheel truck similar to one used in marijuana smuggling in the area six months earlier, and a pickup truck owned by a man considered by the Drug Enforcement Agency (DEA) to be a primary suspect in marijuana smuggling. Swygert gave this information to DEA Agent Rayner who put the large truck under surveillance. Later that night the truck was driven to another motel less than an hour away in South Carolina and remained there.

The next day, Agent Rayner saw a similar or identical truck in a gas station in the Richmond Hill area. The license plate on this truck was bent so that it could not be read, and Rayner felt this had been done deliberately to avoid identification. Agent Rayner later saw this truck two or more times driving south and north on U.S. 17.

The night of November 24 was bitterly cold. At approximately 10:15 p. m. Agent Rayner was told by CPO Arangio that he had just received an anonymous telephone tip that marijuana was to be unloaded that evening at the Laurel View Docks, Sunbury, Georgia. Rayner and CPO Ostrowski drove to the Sunbury area and proceeded toward the Laurel View Docks along a dirt road. They were followed by other officers; some were also going to the Laurel View Docks and others were going to block

off the dirt road. The road forks at the end, one fork going to Laurel View Docks and the other to Morgan's Dock, which is about a mile downriver from Laurel View Docks. As Rayner and Ostrowski proceeded along the dirt road, they were met by a car traveling at high speed. They recognized it as belonging to the owner of Morgan's Dock. Their suspicions were aroused. Rayner decided to check Morgan's Dock both because it had been used in the recent past for unloading multi-ton quantities of marijuana from shrimp boats and because other officers were going to Laurel View. Rayner and Ostrowski turned into the side road to Morgan's Dock, which is not dedicated to public use. They passed by a "private road—no trespassing" sign.

Upon reaching the dock's parking lot, at approximately 11:00 p. m., Rayner noticed that the dock was not open for normal business. Instead, in his headlights, he saw men standing around a ten-wheel truck backed up to the dock, identical to the large truck or trucks he had previously seen. He could not, however, see the license plate at that time and so could not make a definite identification. Two men at the front of the truck fled. Rayner stepped from his car, shouldered his gun, and shouted, "Federal Officers, stand where you are." Ostrowski then stepped from the car and drew his gun as well. Rayner and Ostrowski walked forward and saw bales of marijuana open to view in the truck and other bales on the dock, and a trail of marijuana leading to a nearby shrimp boat, the Sea Star. Suspects fled in all directions. Edmonds and Ingram were arrested hiding underneath a table near a sorting shed. Jones came to the front of the truck with his hands over his head. Carlton was found lying in the mud under the dock.[1]

The officers arrested the appellants at the scene and confiscated 709 bales of marijuana, 105 from the truck and 604 from the boat, a total of about 40,000 pounds.

---

[1]. Another defendant, Posey, also arrested at the scene, was severed and after a separate trial was convicted. His appeal is decided contemporaneously with this case. *U. S. v. Posey,*

611 F.2d 1386 (5th Cir. 1980). Several other persons in the area were neither detained nor charged.

The appellants assert that they had the permission of Morgan to use the dock, but presented no proof to this effect.

## II. The 4th Amendment issue.

■ The district court denied appellants' motion to suppress on the ground they had neither possessory interest in the premises, as required by *Jones v. U. S.*, 362 U.S. 257, 264, 80 S.Ct. 725, 4 L.Ed.2d 697, 704 (1960), nor any privacy interest in the premises, as required by *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 401 (1978). Appellants point out that the Supreme Court in *Rakas* pretermitted decision of whether the "automatic standing" rule of *Jones* survived *Simmons v. U. S.*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *Rakas*, 439 U.S. at 135 n.4, 99 S.Ct. at 426 n.4, 58 L.Ed.2d at 396 n.4. They assert that *Jones* still has vitality and that they have the same standing to challenge the validity of the search that Morgan, the owner of the dock, would have had. We do not need to decide how much, if any, of *Jones* survives *Simmons* and the rationale of *Rakas*. Assuming that the appellants could assert the same Fourth Amendment rights as owner Morgan, these rights were not violated.

Appellant's theory is that because Morgan's Dock was private property and the officers were trespassers, nothing they observed gave probable cause either to arrest or to search. While there was a "no trespassing" sign on the entrance road leading to the premises, an officer who had resided in the area for 23 years testified that the reputation in the community was to the effect that the public was welcome to use the dock area and that the public did use it. The district court found that despite the sign the public had long had free access to the dock, and that conclusion is not plainly erroneous. Other than the presence of the sign, there was no evidence that the dock was "private" to owner Morgan and those specifically authorized to use it. This was not a dock for private use for either fishing,

or embarkation and debarkation of boats, or docking and storage. It was a place not only where boats docked and were unloaded but also a place of business activity where necessarily persons and vehicles had to come and go. The parking lot was in the open. Sorting of seafood landed at the dock was carried on both in the open and in a shed. The officers were not trespassers. They invaded the expected privacy of no one when they drove into the parking lot at the dock. This occurred at 11 p. m. on a bitter winter night. The car of the owner had been seen minutes before, leaving the area at high speed. The dock had recently been the scene of massive off-loading of marijuana. The officers had received an anonymous tip that marijuana was to be unloaded that night a mile away at another dock. These circumstances are taken together with what the officers saw immediately as they drove into the parking area. They saw at once, in the light of their headlights, in the otherwise unlighted dock area, backed up to the dock, a ten wheel truck similar to the truck seen earlier at the motel at the same time as a pickup truck belonging to a suspected marijuana smuggler, and they saw several persons present but observed no handling of seafood taking place. All of these circumstances gave the officers, at a minimum, reasonable suspicion that criminal activity was afoot.[2]

They set about immediately to investigate. But even before they spoke the covey flushed. The two men at the front of the truck fled. The officers moved around the truck and then saw marijuana in open view and picked up the overwhelming scent of marijuana pervading the area. None of this investigatory activity invaded anyone's expectation of privacy, including that of owner Morgan.

The argument is made that a customs officer cannot search unless there is at least a high degree of probability that a border crossing has occurred, and that no such probability existed here. Thus, it is con-

2. *U. S. v. Bass*, 551 F.2d 962 (5th Cir. 1977), involved a seizure of marijuana late at night at a closed commercial fish house. We held that

defendants had shown no basis for asserting any expectation of privacy.

tended, CPO Ostrowski's participation made the seizure invalid. If the argument ever has merit it has none here where Ostrowski participated in an investigatory stop and in doing so observed numerous large bales of marijuana in plain view.

*III. Sufficiency of the evidence.*

■ The evidence was sufficient as to all defendants.

None of the defendants was "merely present" at the scene. Jones was the registered owner of the marijuana-laden shrimp boat. Although the night was extremely cold he wore no jacket, appeared sweaty, smelled of marijuana, and was covered with burlap fibers.

Carlton had been seen earlier driving the ten-wheel tractor and was found lying in the mud under the dock. His driver's license was found in the tractor.

Ingram was recognized by the officers as one of the persons at the front of the truck when the agents' headlights illuminated the area, and he fled. He and Edmonds were found hiding under a table, wearing short sleeve shirts, sweating, and covered with fibers and residue.

Reading the record in the light most favorable to the government, as we must, the evidence is sufficient. *See e. g., U. S. v. Whitmire,* 595 F.2d 1303, 1316 (5th Cir.), *pet. for cert. filed,* No. 79–375, 48 U.S.L.W. 3262 (1979); *U. S. v. Gomez-Rojas,* 507 F.2d 1213, 1221 (5th Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

*IV. Jones' motion to sever.*

■ Jones orally moved at trial to be severed but only after both sides had rested.[3] He made no showing of the specific nature, probative value, or availability of the co-defendant testimony that he allegedly wished to offer. *Cf. Byrd v. Wainwright,* 428 F.2d 1017 (5th Cir. 1970). The motion was properly denied.

*V. Challenge to the grand and petit juries.*

Appellants moved to dismiss the indictment on the ground it did not comply with the Jury Selection and Service Act, 28 U.S.C. §§ 1861–69 (1976). Much of the data urged in support of this theory was extrapolated from that presented in *U. S. v. Butler,* 611 F.2d 1066 (5th Cir. 1980). For several reasons that need not be developed, it is questionable that the data was relevant to this indictment and trial, but, if it was, the affirmance of *Butler* settles the matter. *See also U. S. v. Maskeny,* 609 F.2d 183 (5th Cir. 1980).

AFFIRMED.

---

**3.** Pre-trial motions for severance did not include a request by Jones to have his trial severed from that of the defendants with whom he was ultimately tried.